# Exhibit X

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE AMERICAN HOSPITAL ASSOCIATION,<br>800 Tenth Street, NW, Suite 400<br>Washington, DC 20001, *et al.*,<br><br>*Plaintiffs,*<br><br>–v–<br><br>ALEX M. AZAR II, in his official capacity as the<br>Secretary of Health and Human Services,<br>200 Independence Avenue, SW<br>Washington, DC 20201, *et al.*,<br><br>*Defendants.* | Case No. _____ |

## AFFIDAVIT OF WENDI BARBER
## IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

I, Wendi Barber, state as follows under the pains and penalties of perjury.

1. I am the Vice President of Finance and Chief Financial Officer ("CFO") of Fletcher Hospital, Inc. d/b/a Park Ridge Health ("Park Ridge"), a Plaintiff in this action.

2. I have been Vice President of Finance and CFO at Park Ridge for four (4) years. Before joining Park Ridge, I was the CFO at Castle Medical Center on the island of O'ahu in Hawaii for three (3) years – which like Park Ridge participated in the 340B drug program at issue in this case. I hold both a bachelor's degree and master's degree in business administration.

3. The information set forth in this affidavit is based upon my personal knowledge.

### Park Ridge and the Population It Serves

4. Park Ridge is a not-for-profit health care system headquartered in Hendersonville, North Carolina, about 15 miles south of Asheville, North Carolina. Park Ridge employs more than 125 providers who practice at 34 locations across Henderson, Buncombe, and Haywood Counties. Our combined network of 250 medical providers serves the

communities of Hendersonville, Mills River, Fletcher, Clyde, Arden, Weaverville and Asheville, North Carolina, and includes 30 primary care providers and over 89 specialists and hospital-based providers representing over 20 specialties.

5. Park Ridge has served these communities for over 100 years, including when, in 1916, it employed the very first registered nurses in North Carolina.

6. Park Ridge is part of Adventist Health System ("AHS"), a network of approximately 48 Seventh-day Adventist-affiliated hospitals, as well as skilled nursing facilities, physician offices, home health agencies, hospice providers, urgent care facilities, and other providers in nine states. Park Ridge is the only Adventist-affiliated hospital in North Carolina.

7. Park Ridge is also a member of the American Hospital Association ("AHA"), another of the Plaintiffs in this case.

8. Park Ridge is licensed as a 103-bed hospital, with significant capacity to care for behavioral patients. It also has several outpatient clinics.

9. The communities Park Ridge serves contain a large percentage of elderly and retired persons, including a large number of Medicare beneficiaries. In fiscal year 2017, Medicare was responsible for approximately 52% of Park Ridge's gross revenues. Approximately two thirds of Park Ridge's behavioral and psychological health services are devoted to geriatric patients.

10. Park Ridge was able to provide nearly $25 million in uncompensated care in 2017.

11. Park Ridge is a "covered entity," as defined in 42 U.S.C. § 256b(4)(A), for purposes of the 340B drug program created by Congress in 1992 ("the 340B Program"), by

virtue of its qualification as a "disproportionate share" hospital that treats a large percentage of indigent patients.

### The Impact of the 340B Provisions of the OPPS Rule on Park Ridge

12. The 340B Provisions of the OPPS Rule, which were issued by the Centers for Medicare and Medicaid Services ("CMS") of the Department of Health and Human Services ("HHS") on November 1, 2017 and went into effect on January 1, 2018, have reduced Medicare payments to hospitals for drugs purchased under the 340B discounted drug program ("340B Program").

13. The previous CMS payment rate for these drugs was Average Sales Price ("ASP") plus 6%. The OPPS Rule reduced this payment rate by 28.5 percentage points, from ASP plus 6% to ASP minus 22.5%.

14. Based on 2016 annualized volume, Park Ridge has estimated that the payment reduction set forth in the 340B Provisions of the OPPS Rule will result in a loss to Park Ridge of over $3.7 million per year. Taking into account the budget-neutrality provisions of the OPPS Rule, Park Ridge has estimated that its net losses under the 340B Provisions of the OPPS Rule will be approximately $3.3 million per year.

15. Participation in the 340B program and the margin between hospitals' drug acquisition costs and Medicare payment rates that this program creates have helped Park Ridge provide, on its own and in partnership with other not-for-profit community-based services, health care programs to its communities, including the underserved populations within those communities, that would otherwise be financially unsustainable.

16. Because of the 340B program, Park Ridge has been able to increase its margin to, among other things, (1) help support increased access to behavioral health and psychiatric

3

services, which serve a large geriatric population and a disproportionate share of indigent patients in the community, including by beginning much-needed renovations within the inpatient unit, (2) establish four infusion centers for the comprehensive treatment of cancer and other diseases (centers which provide services to a disproportionately large Medicare population, even as compared to the large Medicare population Park Ridge otherwise serves), (3) expand its obstetrics and gynecology ("OBGYN") capabilities (which also serve a disproportionate share of indigent patients in the community), and (4) partner with various community not-for-profits to address other healthcare and social needs within Western North Carolina, such as obesity, prescription drug abuse, child advocacy, affordable housing, community health and wellness, and economic development.

17. In short, the savings from the 340B program provide Park Ridge with increased resources that, in turn, enable it to provide services that it otherwise could not make available, allowing low-income individuals to receive services that they would not otherwise be able to afford.

18. The 340B Provisions of the OPPS Rule at issue in this case threaten various Park Ridge programs and community-based-partnerships that further serve the indigent as a result of the 340B program savings, by depriving Park Ridge of the resources that allow these programs to exist. For example, the nearly-30% payment reduction set forth in those provisions is threatening the continued health, and potentially the existence, of Park Ridge's geriatric behavioral health services and four infusion centers, which as noted above serve a disproportionately large percentage of Medicare beneficiaries. Park Ridge has planned to purchase a second CT scanner to ensure appropriate and timely clinical care for stroke patients, but it has been forced to delay these plans because of the 340B Program cuts. Park Ridge is also

being forced to delay replacement of aging imaging equipment, including X-Ray rooms that are now past their useful life. The nearly 30% payment reduction in the OPPS Rule is threatening Park Ridge's geriatric psychiatric program, its planned expansion of primary care services, and its ongoing ability to support its local Federally Qualified Health Center, pregnancy centers in underserved communities, non-acute behavioral health needs, and child-advocacy programs in partnership with the county.

19. If the 340B Provisions of the OPPS Rule and the new payment rate are allowed to remain in effect, Park Ridge will be forced to evaluate and likely curtail at least some of the important programs through which it provides uncompensated care to the communities it serves.

Signed under penalty of perjury this 4th day of September, 2018.

*Wendi Barber*

Wendi Barber
Vice President of Finance and
Chief Financial Officer
Park Ridge Health

5